SOUTHSTAR EXPLORATION v. CORPORATION COMMISSION OF STATE OF OKLA.
2022 OK CIV APP 9
Case Number: 119400
Decided: 03/21/2022
Mandate Issued: 04/14/2022
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV
Cite as: 2022 OK CIV APP 9, __ P.3d __

 
SOUTHSTAR EXPLORATION, LLC, Protestant/Appellant/Counter-Appellee,
v.
THE CORPORATION COMMISSION OF THE STATE OF OKLAHOMA and 7C LAND & MINERALS COMPANY, Applicants/Appellees/Counter-Appellants.
APPEAL FROM THE OKLAHOMA CORPORATION COMMISSION
AFFIRMED IN PART, REVERSED IN PART AND REMANDED
William A. Johnson, Kurt M. Rupert, Matt W. Brockman, HARTZOG CONGER CASON, LLP, Oklahoma City, Oklahoma, for Protestant/Appellant/Counter-Appellee
Andrew R. Chilson, INTERIM CHIEF GENERAL COUNSEL, Dana M. W. Ashcraft, DEPUTY GENERAL COUNSEL, OKLAHOMA CORPORATION COMMISSION, Oklahoma City, Oklahoma, for Applicant/Appellee/Counter-Appellant Oklahoma Corporation Commission
Gregory L. Mahaffey, Caleb A. Hartwell, Scott R. Verplank, Jr., MAHAFFEY & GORE, P.C., Oklahoma City, Oklahoma, for Applicant/Appellee/Counter-Appellant 7C Land & Minerals Company
STACIE L. HIXON, JUDGE:
¶1 Appellant/Counter-Appellee SouthStar Exploration, LLC (SouthStar) appeals the determination of participation costs established by an Oklahoma Corporation Commission pooling order appointing SouthStar as operator over a well within a previously-established drilling and spacing unit. SouthStar recompleted the Graves 2-32 into the McLish formation, and sought to pool interests therein within the unit. SouthStar contends the Commission erred by using, in part, the pre-existing Graves 2-32 well's salvage value (in addition to the costs to recomplete the well and lease operating expenses) to determine electing participants' share of costs to produce and develop the McLish. SouthStar also contends that the Commission's determination of participation costs for the well and related saltwater disposal costs is not supported by substantial evidence.
¶2 Appellee/Counter-Appellant 7C Land & Minerals Company ("7C") contends that it holds a leasehold interest in the McLish formation within the unit, and elected to participate in the pooled unit. 7C appeals the Commission's requirement in the pooling order that 7C prepay participation costs in the well, as opposed to satisfying its obligation from funds held in suspense by SouthStar pending the outcome of separate litigation in which SouthStar has challenged 7C's interest in the McLish.
¶3 Under the facts of record and applicable law, we hold the Commission's determination of the costs to develop and produce from the McLish through the recompleted Graves 2-32 well is not contrary to law, that the Commission's determination of costs related to the well and saltwater disposal are supported by substantial evidence, and affirm those aspects of the pooling order. We determine that the Commission's requirement that 7C prepay its share of these costs to elect to participate in the well is not supported by substantial evidence because the Commission failed to consider funds already held in suspense by SouthStar attributable to 7C's contested interest in the lease. The Court reverses the Commission's Pooling Order No. 716828, dated February 8, 2021 on this point only, and remands for further consideration consistent with this Opinion.
BACKGROUND
¶4 SouthStar is the operator of the Graves 2-32 well located in an eighty (80) acre drilling and spacing unit in the North Half (N/2) of the Southeast Quarter (SE/4) of Section 32, Township 2 North, Range 1 East, Garvin County. Nonparty Crusader Energy Group drilled the Graves 2-32 in 2006. The well penetrated the Hoxbar, Viola, 1st and 2nd Bromide, Tulip Creek (or 3rd Bromide), McLish and Oil Creek formations, but was completed uphole of the McLish in the Tulip Creek and 2nd Bromide formations.
¶5 At the time the well was drilled, SouthStar, Biscuit Hill, and M&M owned approximately 48% of the working interests in the well, collectively. The remaining interest was owned by Crusader, and was subsequently acquired by non-party Jones Energy, LLC. SouthStar, Biscuit Hill and M&M jointly acquired Jones Energy's 52% interest in the Graves 2-32 in 2016, along with the Graves 1-32, and the Minter 1-32 saltwater disposal well located in the unit. SouthStar took over operations of the Graves 2-32 in July 2016, commenced operations to test the McLish below 5,177 feet in December 2016, and began producing therefrom in December 2016.
¶6 The Commissioners of the Land Office (CLO) own 50% of the minerals underlying the McLish. SouthStar nominated those minerals for lease. SouthStar and 7C each bid upon the lease. 7C was the successful bidder, and received an oil and gas lease covering an unleased 40-acre mineral interest in Graves 2-32 below the base of the Tulip Creek formation (i.e., in the McLish). SouthStar and 7C filed competing pooling applications, among other requests for relief. Both applications were heard before an Administrative Law Judge (ALJ) in October and November of 2019.
¶7 The ALJ determined SouthStar's application to pool the unit in the McLish should be granted, as well as its request to be appointed operator over the Graves 2-32. The ALJ also determined the cost of development and production to be SouthStar's proposed $1,647,601.00, representing the sums spent to drill the original well in 2006 when operated by Crusader, to which 50% would be chargeable to the McLish, for a total of $411,900.25 to be borne by 7C. This cost was in addition to half of the $255,812.00 cost to recomplete the well ($127,906.00) and half of $41,907.43 ($20,953.72) for saltwater disposal. Though SouthStar argued a higher cost for saltwater disposal to include original costs to drill its disposal well and/or an estimated cost to transport the saltwater through an existing pipeline ($146,676.00), the ALJ determined the reasonable cost of saltwater disposal to be the $0.50 per barrel SouthStar was charging its working interest owners for that expense.
¶8 7C objected that SouthStar could not recover drilling costs it did not incur at the time the well was drilled, i.e., costs incurred by Crusader. Further, 7C argued its share of expenses to develop and produce the McLish through the recompleted Graves 2-32 should be based on the salvage value of the wellbore and equipment, the recompletion costs, and lease operating expenses. Though the appellate referee took the same position as the ALJ, the Commission limited costs to the salvage value of the well, in addition to recompletion costs and lease operating expenses and $0.50 per barrel for saltwater disposal, and determined participants' share of costs to be $194,822.22.
¶9 Southstar appeals the Commission's determination of these costs.
¶10 At issue in 7C's counterappeal, 7C contends it should not have been required to pay its participation costs in advance to protect SouthStar's interest in recovering its costs. After 7C prevailed in the bid for its lease, SouthStar challenged that interest in the United States District Court of the Western District of Oklahoma. $1,025,044.50 in production proceeds were held in suspense and deposited with the Western District pending resolution of 7C's and SouthStar's respective interests. Additionally, 7C contends that SouthStar itself holds $256,084.39 in suspense that is potentially due 7C, should it retain its interest in the lease. The ALJ determined that 7C should not be obligated to prepay its costs, because adequate funds were on hold as security for 7C's obligation. The appellate referee reversed the ALJ's recommendation, finding that Commission had no jurisdiction over funds held in the Western District. The Commission directed that 7C prepay costs within 25 days.
¶11 7C appeals the Commission's order that it prepay its share of costs when it elected to participate in the pooled unit.
STANDARD OF REVIEW
¶12 The Oklahoma Constitution provides the standard of review for appeals from Commission orders:
The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and in all appeals involving an asserted violation of any right of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts. In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence. Upon review, the Supreme Court shall enter judgment, either affirming or reversing the order of the Commission appealed from. 
Oklahoma Const. Art. IX, § 20. The Commission has wide discretion in the performance of its legal duties, and its findings of fact and conclusions of law must be upheld by an appellate court unless the findings are not supported by substantial evidence or the conclusions are contrary to law. Shell Oil Co. v. Davidor & Davidor, , ¶ 0 (syllabus 1), . Substantial evidence is defined as that which possesses substance and relevance and will induce conviction that the order made was proper. Union Texas Petroleum v. Corporation Comm'n, , ¶ 31, .
ANALYSIS
A. SouthStar's Appeal
¶13 SouthStar contends that the Commission's employment of salvage value to determine actual and reasonable well costs to be shared by 7C is contrary to law; that the Commission's determination of actual and reasonable well costs is not supported by substantial evidence; and that the pooling order's saltwater disposal costs are not supported by substantial evidence.
1. Reasonable costs to develop and produce the McLish.
¶14 The first issue before the Court is the amount of costs to which SouthStar is entitled to receive under the Commission's pooling order.
¶15 The governing statute, (e), states in relevant part:
All orders requiring such pooling shall be made after notice and hearing, and shall be upon such terms and conditions as are just and reasonable and will afford to the owner of such tract in the unit the opportunity to recover or receive without unnecessary expense the owner's just and fair share of the oil and gas. The portion of the production allocated to the owner of each tract or interests included in a well spacing unit formed by a pooling order shall, when produced, be considered as if produced by such owner from the separately owned tract or interest by a well drilled thereon. Such pooling order of the Commission shall make definite provisions for the payment of cost of the development and operation, which shall be limited to the actual expenditures required for such purpose not in excess of what are reasonable, including a reasonable charge for supervision. In the event of any dispute relative to such costs, the Commission shall determine the proper costs after due notice to interested parties and a hearing thereon. 
(emphasis added). As the plain language instructs, the Commission must consider whether an actual expenditure was required to be made, and whether it is in excess of what is reasonable. See generally W.K. Kirkman, Inc. v. Oklahoma Corp. Comm'n, , ¶¶ 12-13, (for the Commission to limit its approval to perfunctory approval of every invoice submitted renders the statute "totally meaningless.") The costs to be considered under the statute are those to produce and develop the McLish common source of supply subject to the pooling order, and to what extent this includes the original drilling costs of the Graves 2-32 from 2006.
¶16 SouthStar contends that it is entitled to recover the full extent of sums a previous operator spent to drill the Graves 2-32 well in 2006, plus the cost to recomplete the well, because it could not have eventually reached and produced from the McLish formation without drilling the original well. 7C counters that, if costs are assessed in this manner, costs must be limited to what SouthStar actually spent, not a previous operator, where SouthStar owned only a partial working interest at the time. 7C also asserts that it is not reasonable to calculate its share from the full cost of drilling the Graves 2-32, which was 10 years old at the time of the recomplete.
¶17 Both parties cite to Wood Oil Company v. Corporation Comm'n, , ¶¶ 20-21, ("Wood I"), in support of their respective positions. In that case, Wood Oil obtained production from an abandoned well it had acquired from a third party. It argued the costs to be shared by participants in a subsequent drilling unit should include its own costs to obtain production, as well as the previous entity's expenses to drill the well. The Oklahoma Supreme Court held the prior operator's expenses could not be included:
The Commission found the cost of the development and equipping of the well to be $33,000. The correctness of this amount as representing the actual outlay by Wood Oil is not questioned. But it is urged that there should have been added thereto the further sum of $50,000 which represented the cost to another who had drilled the well hole that was utilized by Wood Oil in obtaining the production. It appears that a former lessee of the premises drilled the well and thereafter abandoned it and surrendered the lease. Thereafter Wood Oil, who had sustained no part of the cost of the hole, obtained its lease and utilized the hole in obtaining the production. In view of the express limitation in the law, the fact that the $50,000 represents no actual expenditure by Wood Oil is sufficient to preclude any right in Wood Oil to have same or any part thereof included as cost of development and equipment. 
Id. at ¶ 20.
¶18 Accordingly, under Wood I, SouthStar is not entitled to recover expenses for the drilling of the Graves 2-32 that it did not itself, or the interests it represents, incur when the well was drilled. SouthStar has cited no authority that its subsequent purchase of Jones Energy's working interest entitles it to reimbursement of costs Jones Energy's predecessor, Crusader, spent to drill the well. The Commission did not err, or rule contrary to law, by declining to award SouthStar the entirety of these expenses for this reason alone.
¶19 The next issue for our consideration is whether the Commission erred in its determination of participation costs by limiting them, in part, by the value of the well. 7C does not contend that SouthStar was not entitled to recoup at least some of its earlier expenses drilling the Graves 2-32 well. Rather, 7C argued that the reasonable limit on SouthStar's recoverable costs should be the salvage value of the well, plus the cost to recomplete the well and lease operating expenses. In support, 7C relies on Wood Oil Co. v. Corporation Comm'n, , ("Wood II"). Wood II concerned the Commission's determination of drilling and completion costs to be shared among the same parties as Wood I. Wood Oil appealed amounts deducted from its recoverable drilling costs for the value of casing and tubing salvaged from the well, arguing its value should be less than the "list" price for such items. However, evidence was presented that, due to scarcity, the items were worth more. The Court determined the Commission "was correct in basing its determination on 'actual market values', the usual legal criteria in such matters" and found the finding to have been supported by substantial evidence. Id. at ¶ 13. Wood II does not hold that the appropriate measure of expenditures to be assessed under section 87.1(e) for an existing well is necessarily its salvage value.
¶20 To address this issue, in the absence of other binding precedent on the issue, we must give effect to the plain language of the statute. The cardinal rule of statutory interpretation is to ascertain and give effect to legislative intent and purpose as expressed by the statutory language. Odom v. Penske Truck Leasing Co., , ¶ 17, . It is presumed that the Legislature has expressed its intent in a statute's language and that it intended what it so expressed. Id. Only where legislative intent cannot be ascertained from the language of a statute, as in cases of ambiguity, are rules of statutory interpretation employed. Id. at ¶ 18. The test for ambiguity is whether the statutory language is susceptible to more than one reasonable interpretation. Id. Where a statute is ambiguous, or the meaning uncertain, "it is to be given a reasonable construction, one that will avoid absurd consequences if this can be done without violating legislative intent." Id. The legislative intent will be ascertained from the whole act in light of its general purpose and objective considering relevant provisions together to give full force and effect to each. Id. at ¶ 48.
¶21 Section 87.1(e) requires the Commission to make provisions for the "cost of the development and operation" of the pooled unit, "limited to the actual expenditures required for such purpose not in excess of what are reasonable." We find no ambiguity in the statute, and consider the entirety of its plain language. Here, SouthStar focuses upon the term "actual expenditures" and correctly surmises that "actual expenditures" does not mean "salvage value." Salvage value is, by definition, "[t]he value of an asset after it has become useless to the owner; the amount expected to be obtained when a fixed asset is disposed of at the end of its useful life . . . ." Black's Law Dictionary 1550 (11th
¶22 However, we decline to read this term of the statute in a vacuum, as SouthStar suggests. SouthStar interprets the "reasonable" language in the statute to modify "actual expenditures" alone, meaning that any actual expenditures to drill the well must have been reasonable at the time made, and are otherwise wholly recoverable. The Court disagrees. Giving effect to the full language of the statute (and section 87.1(e) as a whole), it requires recovery of expenses necessary to develop and produce the McLish, not upper formations, and requires that those expenditures not exceed what is reasonable. Ordinarily, a party acquiring a 10-year-old well to recomplete would not pay the original drilling expenses, but would pay based the value of the well, plus the additional expense to recomplete it. The Commission's reliance on salvage value to limit the actual expenditures recoverable is not contrary to the statute, when used to determine what is reasonable. What expenditures are reasonable is a factual determination that would depend in part on the value of the existing well. We therefore consider whether the Commission's determination that this portion of SouthStar's actual expenditures should be limited to the Graves 2-32's salvage value is supported by substantial evidence.
¶23 SouthStar presented evidence of its actual expenditures to drill the well in 2006 to develop and produce the Bromides. It also presented evidence the well continued to produce around 20 barrels of oil per day from the Bromides common source of supply, in support of its contention that the well was not yet depleted. However, beyond its expenditures, SouthStar did not present evidence of the value of the well, or any evidence of what one might expect to pay as fair market value for the Graves 2-32 in 2016 in contemplation of recompleting it. The Commission was not obligated to accept that the original expenses to drill the well in 2006 were reasonable for development of the McLish ten years later, in the face of 7C's competing evidence.
¶24 It was undisputed that the well was 10 years old and had produced from the Bromides for years, and that one purchasing the well at that time would do so at salvage value. Specifically, 7C's president, Bailey Cook, testified that, as one who buys and sells leases, it was his practice to buy producing leases based on the well's salvage value, the gravel on the road, and what he believed the future of production was going to be. He testified the seller's original drilling cost does not figure into that price. On this basis, Cook testified that SouthStar's completed well costs should be $136,110.50. His estimate of the salvage value of the well itself was $91,925.00 based on his estimate of the value of the equipment in the well. The Commission calculated 7C's share of participation costs based on half this salvage value ($45,962.50), though the total determination of costs was almost $60,000.00 more than Cook proposed.
¶25 The Commission was not obligated to accept SouthStar's evidence that its original expenditures to drill the Graves 2-32 were a reasonable measure of the cost to develop and produce the McLish, in the face of competing evidence that one purchasing a lease in that position would pay not more than the salvage value for a 10-year-old well to be recompleted. While the Graves 2-32 would not have reached the McLish without being drilled through the Bromides, substantial evidence supports it would be unreasonable to require a party subject to a forced pooling order to pay more than one who might otherwise share in the cost to recomplete an existing well. The Court finds the Commission's Order was supported by substantial evidence on this point, and should be affirmed.
2. Saltwater disposal.
¶26 SouthStar also contends the Commission's determination of 7C's proportionate share of saltwater disposal at $20,953.72, or $0.50 per barrel, is not supported by substantial evidence.
¶27 As addressed above, section 87.1(e) permits SouthStar to charge a non-operating pooling participant for (1) actual expenditures for development and operation of the well, (2) not in excess of what is reasonable under the circumstances. The operator may not charge a forced pooling participant a fee in excess of its actual cost to dispose of saltwater, plus a reasonable charge for supervision, under a pooling order. See New Dominion, LLC v. Mason, , ¶ 11, , cert. denied.
¶28 Though SouthStar has historically charged $0.50 per barrel to dispose into the Minter well, it argued before the Commission that this rate was reserved to its working interest owners. It requested a total of $1.75 per barrel, or a share of $73,338.00 from 7C, for the proposed purpose of recouping a share of the cost to drill and complete the Minter disposal well and/or the cost of transportation by pipeline between the wells.
¶29 The record shows that the Minter well was drilled by Crusader as a dry hole in 2007 and converted to a saltwater disposal well. Southwest, Biscuit Hill and M&M were working interest owners at that time, who would presumably have carried their proportionate share of drilling that well. They eventually acquired the remaining 52% interest in the Minter well, along with the Graves wells.
¶30 Crusader established the $0.50 per barrel disposal fee for the Minter well, which SouthStar continued. SouthStar's landman, Brian Sullivan, testified the $0.50 covered the lease operating expenses, with no profit included. He arrived at the proposed $1.75 per day in "numerous ways", one way of which was to "look at the actual cost of drilling and completing the Minter #1-32 disposal well as a disposal well." He testified the original costs to drill the Minter well was $1.3 million, to which he proposed allocating approximately 25% to the Graves 2-32 McLish, suggesting 7C be required to bear approximately $342,987.00 of drilling costs related to the Minter well, allocated over a 3 year period to reach $1.75 per barrel. Included in this cost was the expense to construct a pipeline to transport water from the Graves 2-32 to the Minter. SouthStar argued it would be entitled to this cost, because without the pipeline (which already exists and is in use), transportation would be very costly.
¶31 SouthStar did not present evidence of the present value of the Minter well, or its equipment, or what it contended would be a reasonable recovery, apart from its calculation based on the original cost to drill the well. Sullivan did recognize $0.50 was an otherwise reasonable charge for operating a saltwater disposal well.
¶32 For its part, 7C presented evidence that SouthStar (and Crusader) had always charged $0.50 per barrel for disposal into the Minter well, as well as evidence that the well made a profit over and above operating expenses by virtue of this charge in some months. 7C's president Cook also testified that, in his experience as an operator, $0.50 was a normal going rate for saltwater disposal in the area.
¶33 The ALJ, the Appellate Referee and the Commission each determined $0.50 to be a reasonable charge for saltwater disposal. As addressed above, the entirety of Crusader's original cost to drill the well were not SouthStar's actual expenditures in the first place. Even so, the evidence was sufficient for the Commission to conclude both that the $0.50 accounted for more than SouthStar's actual lease operating expenses, and/or that its proposed actual expenditures to drill and operate the well exceeded what was reasonable to produce the McLish. On the record before the Court, the Commission's determination is supported by substantial evidence, and we find no reversible error.
B. 7C's Counter-Appeal
¶34 7C appeals a provision in the pooling order directing it to pay its share of costs to develop and produce the McLish within 25 days of the entry of the Order. It contends SouthStar holds certain funds in suspense adequate to cover its share of development and production costs, and it is inequitable to require 7C to advance funds when adequate security exists.
¶35 Section 87.1(e) provides that a pooling order "shall make definite provisions for the payment of cost of the development and operation. . . ." However, the statute not does require that the Commission require costs to be paid in advance, though no party has disputed that the Commission may enter such an order. See also Superior Oil Co. v. Oklahoma Corp. Comm'n, , ¶ 17, (recognizing the Commission has wide discretion in the performance of its duties, including provisions regarding when costs are to be paid). Resolution of this issue requires us to consider whether the Commission's Order that costs should be prepaid is supported by law and substantial evidence in this case. Id.
¶36 SouthStar recompleted the Graves 2-32 well before it filed its pooling application. By that time, SouthStar had already incurred the cost to recomplete the well. The well produced substantial revenue until it was shut in by the time pooling applications were heard. As a practical matter, the pooling order resolved 7C's participation costs, which would ultimately determine 7C's share of an already-existing pool of revenue, none of which 7C has ever received. Because SouthStar disputed 7C's rights in the lease, most of those funds were paid into the Western District, and out of reach of both parties pending resolution of that case.
¶37 However, as 7C raised before the Commission and as SouthStar's briefing appears to acknowledge, SouthStar holds or did hold in suspense another pool of money--$256,084.39--pending determination of 7C's rights in the lease. It is not mentioned in the Referee's report, or in the pooling order. Prior to the final pooling order the Commission entered a "deliberation order" that set forth its reasoning, which states:
The Referee reversed the ALJ's recommendation stating that such funds are suspended revenues paid into the U.S. District Court for the Western District of Oklahoma resulting from litigation between 7C and SouthStar and thus, fall outside of the Commission's jurisdiction for determining disposition of any such funds. . . . The Commission finds that if 7C elects to participate in the order it should be given the standard 25 days from the issuance date of the order to pay its proportionate part of well costs.
Neither the Deliberation Order nor the record offer insight into the determination that it was necessary for 7C to advance costs for the well, already drilled and producing revenue, other than the Commission's determination that it had no jurisdiction over the funds held by the Western District. It appears from the record that the Commission was either not aware of or did not consider the funds held separately by SouthStar in its determination. However, the record contains no information as to whether those funds remain with SouthStar, any restrictions upon their release to satisfy 7C's participation costs, and whether or not the existence of these separately held funds was adequate protection to SouthStar for the costs it has born for 7C's share in costs of development and production.
¶38 For this reason, we find the Commission's Order on this point is unsupported by substantial evidence and remand for further proceedings to consider the funds held in suspense by SouthStar in its determination of whether 7C should have been required to advance costs in order to participate under the complete facts of this case.
CONCLUSION
¶39 For the foregoing reasons, we find that the Commission's determination of participation costs set forth in the pooling order is not contrary to law and is supported by substantial evidence, both on the costs related to the Graves 2-32 well and saltwater disposal costs, and we affirm the pooling order on those grounds. However, we reverse the Commission's determination that 7C prepay its participation costs, because it appears the funds held in suspense by SouthStar itself were not considered in that determination, and remand for further determination on that issue consistent with this Opinion.
¶40 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
FISCHER, C.J., and BARNES, P.J., concur.
FOOTNOTES
 SouthStar contends that it has entered into a Joint Operating Agreement with Biscuit Hill and M&M, and has or is representing all three entities' interests in the Commission proceeding, in addition to JOA parties Bacara Investments, Inc., and Ceres, LLC.
 SouthStar has contested 7C's acquisition of the lease and interest therein in a separate federal action in the United States District Court for the Western District of Oklahoma. The validity of 7C's interest was not at issue before the Commission.
 7C moved to remove SouthStar as operator and applied to shut-in the Graves 1-32 well, which is not at issue here.
 SouthStar and 7C agreed that development and equipment costs of the Graves 2-32 should be split 50% to the owners of the Bromide production, and 50% to the McLish production. According to its interest, 7C would then be responsible for 50% of the costs allocated to the McLish, if it elected to participate.
 The Minter Well was originally drilled as a dry hole, and converted to a saltwater disposal well.
 The ALJ appears to have been relying on the funds held by the Western District.
 SouthStar complains the Commission's decision cannot be properly evaluated because the Commission must show on appeal how it arrived at its figure for reasonable cost and "how it arrived at its decision to limit the well costs for the Graves 2-32 well to 7C's proportionate part of half of the salvage value of the well" and thus cannot be properly evaluated due to its lack of explanation or analysis supporting its decision. The Commission's Deliberation Order (incorporated into the pooling order) specifically identifies that the Commission determined it was appropriate to limit 7C's proportionate share to the salvage value of the well, identifies with specificity the costs permitted, and incorporates Exhibit 41 from the hearing further setting forth those amounts. SouthStar has plainly been afforded with a clear basis for the Court's ruling, based on an ample record, and has fully briefed those issues. Further, the Court is at no loss to evaluate the Commission's rulings and the issues presented for appeal based on the Order and record presented.
 7C argues this amount is limited to SouthStar's 15% percent interest, and may not include expenses by other parties to SouthStar's JOA, Biscuit Hill and M&M, who held a total of 48% of the working interest when the well was drilled. 7C argues that SouthStar presented no evidence of the parties' JOA. The record is replete with representations by counsel to the Commission, which it appeared to accept, that Southstar was representing the interests of Biscuit Hill and M&M. The Commission limited recoverable costs to the salvage value of the existing well, plus the cost of the recomplete, incurred by SouthStar after it became operator, and lease operating expenses. As addressed herein, we affirm this determination. Therefore, we need not further address the impact of SouthStar's percentage ownership at the time the well was drilled. The Commission's approach did not reduce the amount awarded by any percentage ownership SouthStar, Biscuit Hill or M&M may have had at any point in time, but essentially credits SouthStar with 100% ownership of the well, and 100% of its value, albeit at a measure with which SouthStar disagrees.
 Less the half the parties agreed to be attributed to the Bromide owners.
 SouthStar also cites Marathon Oil Co. v. Oklahoma Corp. Comm'n, , , for the general proposition that a party with an interest in a lower formation is not entitled to a free ride for costs to drill through upper strata in which it holds no interest, and argues that Marathon requires assessment of total drilling costs. We do not interpret the Commission's Order, or 7C's arguments, to take the position that SouthStar is entitled to nothing for the original drilling of the well through upper formations, and the Commission plainly set an amount to recoup those costs in part, in addition to the recomplete and lease operating expenses. Rather, the issue is the proper measure of those drilling costs through the upper formation.
 Cook is an attorney who practices before the Commission, with experience in oil and gas leasing, operating and investments who was presented to testify to 7C's proposed participation costs based on salvage value.
 SouthStar's brief suggests that neither Cook nor another expert witness offered by 7C knew what equipment was actually in the well, attempting to suggest Cook's testimony was unreliable or inadmissible in some fashion. Notably, SouthStar did not object to Cook offering testimony on the value of the well, and elicited testimony from him on this point. Moreover, the testimony SouthStar mentions concerns the potential future cost to equip the well to comingle production from the Bromides and the McLish.
 SouthStar's Reply Brief asserts that "[i]n fact, SouthStar's appeal is based on the failure of the Commission to attribute any value to the Graves 2-32 wellbore" but assessed the fair market salvage value of the "equipment only." Notably, while SouthStar's Brief in Chief argues that the manner in which Cook arrived at the value of the wellbore was based on the value of only the equipment in the well, SouthStar appeared to acknowledge this method was used to derive the value of the well itself. The pooling order states that participation costs include the costs to drill, recomplete and produce from the existing Graves 2-32 well. The Commission also entered a previous Deliberation Order, incorporated into the pooling order, which specifically identifies that it included in participation costs "half the salvage value of the well." The value assigned by the Commission takes into account the wellhead, pumping unit, free water knockout, multiple oil tanks, tubing anchor, downhole pump, sucker rods, tubing, miscellaneous valves and other miscellaneous items. To the extent SouthStar contends there were another expenses or value the Commission should have considered in assessing the salvage value of the well, SouthStar presents no citation to evidence of what that value would be, and no authority demonstrating the Commission's method was in error. In any event, we note that the Commission considered the salvage value as a reasonable limitation on SouthStar's actual expenditures, and we find substantive evidence to support that determination here.
 Absent evidence the well has retained all of its original value, or is perhaps worth more than it originally cost to drill.
 In New Dominion, a pooling applicant's engineer testified that a $0.50 per barrel charge for saltwater disposal was a fair and reasonable cost for pooling, but admitted she had not reached that figure by determining actual disposal costs. Other evidence suggested that, after allocating the costs to drill, complete and equip the saltwater disposal wells at issue, the cost per multiple producing wells was only $.05 per barrel. The Commission adopted the $0.50. The Court of Civil Appeals reversed, because the $0.50 did not represent the applicant's actual expenditures to drill and produce the well.
 On appeal, SouthStar raises this same argument, along with a contention that the $0.50 it charges is for disposal only, and does not incorporate the cost it incurred to build a pipeline between the Graves 2-32 and the Minter well. For our purposes, we treat these arguments as one and the same--SouthStar wishes to recoup its original cost to drill and produce (or dispose into) the well.
 SouthStar's witnesses testified working interest owners shared in the cost. SouthStar did not present other evidence of the amount SouthStar, Biscuit Hill and M&M paid or of actual payment.
 The acquisition of that interest was part of a larger transaction, in which the parties allocated $57,196.00 to the interest in the Minter well.
 Sullivan assumed disposal of 300 barrels per year to reach this figure.
 7C paid the participation costs, as directed by the pooling order to secure its election to participate. SouthStar has argued payment of these sums renders the issue moot. We disagree. See Grand River Dam Auth. v. Eaton, , . SouthStar presented no evidence of an intent to compromise or settle 7C's appeal through the payment.
 Section 87.1(e) provides the operator with a lien against the other owners' share until costs ordered by the Commission are paid, or to provide that the operator is entitled to the other owners' share of production until costs are paid, which plainly suggests the Commission need not order costs to be prepaid, and that other means are available to protect the interest of the operator or owner bearing the costs to develop and produce. Likewise, the Commission's own rules of practice regarding pooling orders directs certain language as to how and when a respondent must communicate an election to participate but does not mention a requirement that costs be paid in advance. See Okla. Admin. Code 165:5-15-3 (2010).
 7C does not challenge on appeal the Commission's reliance on its lack of jurisdiction over the interpled funds as the basis for its order that costs be paid at the time of 7C's election, and therefore we do not address whether the lack of jurisdiction over those funds was an appropriate consideration for whether SouthStar was entitled to advance payment from other sources while those funds are held in suspense.
 In argument, the parties referenced that SouthStar had sought leave to interplead those funds into the Western District, though the parties' briefing on appeal seems to acknowledge the funds remain with Southstar.