SOUTHSTAR EXPLORATION v. CORPORATION COMMISSION OF STATE OF OKLA.
2022 OK CIV APP 9
Case Number: 119400
Decided: 03/21/2022
Mandate Issued: 04/14/2022
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV
Cite as: 2022 OK CIV APP 9, __ P.3d __

 

SOUTHSTAR EXPLORATION, LLC, Protestant/Appellant/Counter-Appellee,
v.
THE CORPORATION COMMISSION OF THE STATE OF OKLAHOMA and 7C LAND & MINERALS COMPANY, Applicants/Appellees/Counter-Appellants.

APPEAL FROM THE OKLAHOMA CORPORATION COMMISSION

AFFIRMED IN PART, REVERSED IN PART AND REMANDED

William A. Johnson, Kurt M. Rupert, Matt W. Brockman, HARTZOG CONGER CASON, LLP, Oklahoma City, Oklahoma, for Protestant/Appellant/Counter-Appellee

Andrew R. Chilson, INTERIM CHIEF GENERAL COUNSEL, Dana M. W. Ashcraft, DEPUTY GENERAL COUNSEL, OKLAHOMA CORPORATION COMMISSION, Oklahoma City, Oklahoma, for Applicant/Appellee/Counter-Appellant Oklahoma Corporation Commission

Gregory L. Mahaffey, Caleb A. Hartwell, Scott R. Verplank, Jr., MAHAFFEY & GORE, P.C., Oklahoma City, Oklahoma, for Applicant/Appellee/Counter-Appellant 7C Land & Minerals Company

STACIE L. HIXON, JUDGE:

¶1 Appellant/Counter-Appellee SouthStar Exploration, LLC (SouthStar) appeals the determination of participation costs established by an Oklahoma Corporation Commission pooling order appointing SouthStar as operator over a well within a previously-established drilling and spacing unit. SouthStar recompleted the Graves 2-32 into the McLish formation, and sought to pool interests therein within the unit. SouthStar contends the Commission erred by using, in part, the pre-existing Graves 2-32 well's salvage value (in addition to the costs to recomplete the well and lease operating expenses) to determine electing participants' share of costs to produce and develop the McLish. SouthStar also contends that the Commission's determination of participation costs for the well and related saltwater disposal costs is not supported by substantial evidence.

¶2 Appellee/Counter-Appellant 7C Land & Minerals Company ("7C") contends that it holds a leasehold interest in the McLish formation within the unit, and elected to participate in the pooled unit. 7C appeals the Commission's requirement in the pooling order that 7C prepay participation costs in the well, as opposed to satisfying its obligation from funds held in suspense by SouthStar pending the outcome of separate litigation in which SouthStar has challenged 7C's interest in the McLish.

¶3 Under the facts of record and applicable law, we hold the Commission's determination of the costs to develop and produce from the McLish through the recompleted Graves 2-32 well is not contrary to law, that the Commission's determination of costs related to the well and saltwater disposal are supported by substantial evidence, and affirm those aspects of the pooling order. We determine that the Commission's requirement that 7C prepay its share of these costs to elect to participate in the well is not supported by substantial evidence because the Commission failed to consider funds already held in suspense by SouthStar attributable to 7C's contested interest in the lease. The Court reverses the Commission's Pooling Order No. 716828, dated February 8, 2021 on this point only, and remands for further consideration consistent with this Opinion.

BACKGROUND

¶4 SouthStar is the operator of the Graves 2-32 well located in an eighty (80) acre drilling and spacing unit in the North Half (N/2) of the Southeast Quarter (SE/4) of Section 32, Township 2 North, Range 1 East, Garvin County. Nonparty Crusader Energy Group drilled the Graves 2-32 in 2006. The well penetrated the Hoxbar, Viola, 1st and 2nd Bromide, Tulip Creek (or 3rd Bromide), McLish and Oil Creek formations, but was completed uphole of the McLish in the Tulip Creek and 2nd Bromide formations.

¶5 At the time the well was drilled, SouthStar, Biscuit Hill, and M&M owned approximately 48% of the working interests in the well, collectively.

¶6 The Commissioners of the Land Office (CLO) own 50% of the minerals underlying the McLish. SouthStar nominated those minerals for lease. SouthStar and 7C each bid upon the lease. 7C was the successful bidder, and received an oil and gas lease covering an unleased 40-acre mineral interest in Graves 2-32 below the base of the Tulip Creek formation (i.e., in the McLish).

¶7 The ALJ determined SouthStar's application to pool the unit in the McLish should be granted, as well as its request to be appointed operator over the Graves 2-32. The ALJ also determined the cost of development and production to be SouthStar's proposed $1,647,601.00, representing the sums spent to drill the original well in 2006 when operated by Crusader, to which 50% would be chargeable to the McLish,

¶8 7C objected that SouthStar could not recover drilling costs it did not incur at the time the well was drilled, i.e., costs incurred by Crusader. Further, 7C argued its share of expenses to develop and produce the McLish through the recompleted Graves 2-32 should be based on the salvage value of the wellbore and equipment, the recompletion costs, and lease operating expenses. Though the appellate referee took the same position as the ALJ, the Commission limited costs to the salvage value of the well, in addition to recompletion costs and lease operating expenses and $0.50 per barrel for saltwater disposal, and determined participants' share of costs to be $194,822.22.

¶9 Southstar appeals the Commission's determination of these costs.

¶10 At issue in 7C's counterappeal, 7C contends it should not have been required to pay its participation costs in advance to protect SouthStar's interest in recovering its costs. After 7C prevailed in the bid for its lease, SouthStar challenged that interest in the United States District Court of the Western District of Oklahoma. $1,025,044.50 in production proceeds were held in suspense and deposited with the Western District pending resolution of 7C's and SouthStar's respective interests. Additionally, 7C contends that SouthStar itself holds $256,084.39 in suspense that is potentially due 7C, should it retain its interest in the lease. The ALJ determined that 7C should not be obligated to prepay its costs, because adequate funds were on hold as security for 7C's obligation.

¶11 7C appeals the Commission's order that it prepay its share of costs when it elected to participate in the pooled unit.

STANDARD OF REVIEW

¶12 The Oklahoma Constitution provides the standard of review for appeals from Commission orders:

The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and in all appeals involving an asserted violation of any right of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts. In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence. Upon review, the Supreme Court shall enter judgment, either affirming or reversing the order of the Commission appealed from.

Oklahoma Const. Art. IX, § 20. The Commission has wide discretion in the performance of its legal duties, and its findings of fact and conclusions of law must be upheld by an appellate court unless the findings are not supported by substantial evidence or the conclusions are contrary to law. Shell Oil Co. v. Davidor & Davidor, 1957 OK 159315 P.2d 259Union Texas Petroleum v. Corporation Comm'n, 1981 OK 86651 P.2d 652

ANALYSIS

A. SouthStar's Appeal

¶13 SouthStar contends that the Commission's employment of salvage value to determine actual and reasonable well costs to be shared by 7C is contrary to law; that the Commission's determination of actual and reasonable well costs is not supported by substantial evidence; and that the pooling order's saltwater disposal costs are not supported by substantial evidence.

1. Reasonable costs to develop and produce the McLish.

¶14 The first issue before the Court is the amount of costs to which SouthStar is entitled to receive under the Commission's pooling order.

¶15 The governing statute, 52 O.S. Supp.2017, § 87.1

All orders requiring such pooling shall be made after notice and hearing, and shall be upon such terms and conditions as are just and reasonable and will afford to the owner of such tract in the unit the opportunity to recover or receive without unnecessary expense the owner's just and fair share of the oil and gas. The portion of the production allocated to the owner of each tract or interests included in a well spacing unit formed by a pooling order shall, when produced, be considered as if produced by such owner from the separately owned tract or interest by a well drilled thereon. Such pooling order of the Commission shall make definite provisions for the payment of cost of the development and operation, which shall be limited to the actual expenditures required for such purpose not in excess of what are reasonable, including a reasonable charge for supervision. In the event of any dispute relative to such costs, the Commission shall determine the proper costs after due notice to interested parties and a hearing thereon.

(emphasis added). As the plain language instructs, the Commission must consider whether an actual expenditure was required to be made, and whether it is in excess of what is reasonable. See generally W.K. Kirkman, Inc. v. Oklahoma Corp. Comm'n, 1983 OK CIV APP 73676 P.2d 283 common source of supply subject to the pooling order, and to what extent this includes the original drilling costs of the Graves 2-32 from 2006.

¶16 SouthStar contends that it is entitled to recover the full extent of sums a previous operator spent to drill the Graves 2-32 well in 2006, plus the cost to recomplete the well, because it could not have eventually reached and produced from the McLish formation without drilling the original well. 7C counters that, if costs are assessed in this manner, costs must be limited to what SouthStar actually spent, not a previous operator, where SouthStar owned only a partial working interest at the time.

¶17 Both parties cite to Wood Oil Company v. Corporation Comm'n, 1950 OK 207239 P.2d 1023Wood I"), in support of their respective positions. In that case, Wood Oil obtained production from an abandoned well it had acquired from a third party. It argued the costs to be shared by participants in a subsequent drilling unit should include its own costs to obtain production, as well as the previous entity's expenses to drill the well. The Oklahoma Supreme Court held the prior operator's expenses could not be included:

The Commission found the cost of the development and equipping of the well to be $33,000. The correctness of this amount as representing the actual outlay by Wood Oil is not questioned. But it is urged that there should have been added thereto the further sum of $50,000 which represented the cost to another who had drilled the well hole that was utilized by Wood Oil in obtaining the production. It appears that a former lessee of the premises drilled the well and thereafter abandoned it and surrendered the lease. Thereafter Wood Oil, who had sustained no part of the cost of the hole, obtained its lease and utilized the hole in obtaining the production. In view of the express limitation in the law, the fact that the $50,000 represents no actual expenditure by Wood Oil is sufficient to preclude any right in Wood Oil to have same or any part thereof included as cost of development and equipment.

Id. at ¶ 20.

¶18 Accordingly, under Wood I, SouthStar is not entitled to recover expenses for the drilling of the Graves 2-32 that it did not itself, or the interests it represents, incur when the well was drilled. SouthStar has cited no authority that its subsequent purchase of Jones Energy's working interest entitles it to reimbursement of costs Jones Energy's predecessor, Crusader, spent to drill the well. The Commission did not err, or rule contrary to law, by declining to award SouthStar the entirety of these expenses for this reason alone.

¶19 The next issue for our consideration is whether the Commission erred in its determination of participation costs by limiting them, in part, by the value of the well. 7C does not contend that SouthStar was not entitled to recoup at least some of its earlier expenses drilling the Graves 2-32 well.Wood Oil Co. v. Corporation Comm'n, 1953 OK 386268 P.2d 878Wood II"). Wood II concerned the Commission's determination of drilling and completion costs to be shared among the same parties as Wood I. Wood Oil appealed amounts deducted from its recoverable drilling costs for the value of casing and tubing salvaged from the well, arguing its value should be less than the "list" price for such items. However, evidence was presented that, due to scarcity, the items were worth more. The Court determined the Commission "was correct in basing its determination on 'actual market values', the usual legal criteria in such matters" and found the finding to have been supported by substantial evidence. Id. at ¶ 13. Wood II does not hold that the appropriate measure of expenditures to be assessed under section 87.1(e) for an existing well is necessarily its salvage value.

¶20 To address this issue, in the absence of other binding precedent on the issue, we must give effect to the plain language of the statute. The cardinal rule of statutory interpretation is to ascertain and give effect to legislative intent and purpose as expressed by the statutory language. Odom v. Penske Truck Leasing Co., 2018 OK 23415 P.3d 521Id. Only where legislative intent cannot be ascertained from the language of a statute, as in cases of ambiguity, are rules of statutory interpretation employed. Id. at ¶ 18. The test for ambiguity is whether the statutory language is susceptible to more than one reasonable interpretation. Id. Where a statute is ambiguous, or the meaning uncertain, "it is to be given a reasonable construction, one that will avoid absurd consequences if this can be done without violating legislative intent." Id. The legislative intent will be ascertained from the whole act in light of its general purpose and objective considering relevant provisions together to give full force and effect to each. Id. at ¶ 48.

¶21 Section 87.1(e) requires the Commission to make provisions for the "cost of the development and operation" of the pooled unit, "limited to the actual expenditures required for such purpose not in excess of what are reasonable." We find no ambiguity in the statute, and consider the entirety of its plain language. Here, SouthStar focuses upon the term "actual expenditures" and correctly surmises that "actual expenditures" does not mean "salvage value." Salvage value is, by definition, "[t]he value of an asset after it has become useless to the owner; the amount expected to be obtained when a fixed asset is disposed of at the end of its useful life . . . ." Black's Law Dictionary 1550 (11th ed. 2019).

¶22 However, we decline to read this term of the statute in a vacuum, as SouthStar suggests. SouthStar interprets the "reasonable" language in the statute to modify "actual expenditures" alone, meaning that any actual expenditures to drill the well must have been reasonable at the time made, and are otherwise wholly recoverable. The Court disagrees. Giving effect to the full language of the statute (and section 87.1(e) as a whole), it requires recovery of expenses necessary to develop and produce the McLish, not upper formations, and requires that those expenditures not exceed what is reasonable. Ordinarily, a party acquiring a 10-year-old well to recomplete would not pay the original drilling expenses, but would pay based the value of the well, plus the additional expense to recomplete it. The Commission's reliance on salvage value to limit the actual expenditures recoverable is not contrary to the statute, when used to determine what is reasonable. What expenditures are reasonable is a factual determination that would depend in part on the value of the existing well. We therefore consider whether the Commission's determination that this portion of SouthStar's actual expenditures should be limited to the Graves 2-32's salvage value is supported by substantial evidence.

¶23 SouthStar presented evidence of its actual expenditures to drill the well in 2006 to develop and produce the Bromides. It also presented evidence the well continued to produce around 20 barrels of oil per day from the Bromides common source of supply, in support of its contention that the well was not yet depleted. However, beyond its expenditures, SouthStar did not present evidence of the value of the well, or any evidence of what one might expect to pay as fair market value for the Graves 2-32 in 2016 in contemplation of recompleting it. The Commission was not obligated to accept that the original expenses to drill the well in 2006 were reasonable for development of the McLish ten years later, in the face of 7C's competing evidence.

¶24 It was undisputed that the well was 10 years old and had produced from the Bromides for years, and that one purchasing the well at that time would do so at salvage value. Specifically, 7C's president, Bailey Cook,

¶25 The Commission was not obligated to accept SouthStar's evidence that its original expenditures to drill the Graves 2-32 were a reasonable measure of the cost to develop and produce the McLish, in the face of competing evidence that one purchasing a lease in that position would pay not more than the salvage value for a 10-year-old well to be recompleted. While the Graves 2-32 would not have reached the McLish without being drilled through the Bromides, substantial evidence supports it would be unreasonable to require a party subject to a forced pooling order to pay more than one who might otherwise share in the cost to recomplete an existing well.

2. Saltwater disposal.

¶26 SouthStar also contends the Commission's determination of 7C's proportionate share of saltwater disposal at $20,953.72, or $0.50 per barrel, is not supported by substantial evidence.

¶27 As addressed above, section 87.1(e) permits SouthStar to charge a non-operating pooling participant for (1) actual expenditures for development and operation of the well, (2) not in excess of what is reasonable under the circumstances. The operator may not charge a forced pooling participant a fee in excess of its actual cost to dispose of saltwater, plus a reasonable charge for supervision, under a pooling order. See New Dominion, LLC v. Mason, 2009 OK CIV APP 16217 P.3d 138cert. denied.

¶28 Though SouthStar has historically charged $0.50 per barrel to dispose into the Minter well, it argued before the Commission that this rate was reserved to its working interest owners. It requested a total of $1.75 per barrel, or a share of $73,338.00 from 7C, for the proposed purpose of recouping a share of the cost to drill and complete the Minter disposal well and/or the cost of transportation by pipeline between the wells.

¶29 The record shows that the Minter well was drilled by Crusader as a dry hole in 2007 and converted to a saltwater disposal well. Southwest, Biscuit Hill and M&M were working interest owners at that time, who would presumably have carried their proportionate share of drilling that well.

¶30 Crusader established the $0.50 per barrel disposal fee for the Minter well, which SouthStar continued. SouthStar's landman, Brian Sullivan, testified the $0.50 covered the lease operating expenses, with no profit included. He arrived at the proposed $1.75 per day in "numerous ways", one way of which was to "look at the actual cost of drilling and completing the Minter #1-32 disposal well as a disposal well." He testified the original costs to drill the Minter well was $1.3 million, to which he proposed allocating approximately 25% to the Graves 2-32 McLish, suggesting 7C be required to bear approximately $342,987.00 of drilling costs related to the Minter well, allocated over a 3 year period to reach $1.75 per barrel.

¶31 SouthStar did not present evidence of the present value of the Minter well, or its equipment, or what it contended would be a reasonable recovery, apart from its calculation based on the original cost to drill the well. Sullivan did recognize $0.50 was an otherwise reasonable charge for operating a saltwater disposal well.

¶32 For its part, 7C presented evidence that SouthStar (and Crusader) had always charged $0.50 per barrel for disposal into the Minter well, as well as evidence that the well made a profit over and above operating expenses by virtue of this charge in some months. 7C's president Cook also testified that, in his experience as an operator, $0.50 was a normal going rate for saltwater disposal in the area.

¶33 The ALJ, the Appellate Referee and the Commission each determined $0.50 to be a reasonable charge for saltwater disposal. As addressed above, the entirety of Crusader's original cost to drill the well were not SouthStar's actual expenditures in the first place. Even so, the evidence was sufficient for the Commission to conclude both that the $0.50 accounted for more than SouthStar's actual lease operating expenses, and/or that its proposed actual expenditures to drill and operate the well exceeded what was reasonable to produce the McLish. On the record before the Court, the Commission's determination is supported by substantial evidence, and we find no reversible error.

B. 7C's Counter-Appeal

¶34 7C appeals a provision in the pooling order directing it to pay its share of costs to develop and produce the McLish within 25 days of the entry of the Order. It contends SouthStar holds certain funds in suspense adequate to cover its share of development and production costs, and it is inequitable to require 7C to advance funds when adequate security exists.

¶35 Section 87.1(e) provides that a pooling order "shall make definite provisions for the payment of cost of the development and operation. . . ." However, the statute not does require that the Commission require costs to be paid in advance, though no party has disputed that the Commission may enter such an order.See also Superior Oil Co. v. Oklahoma Corp. Comm'n, 1952 OK 123242 P.2d 454Id.

¶36 SouthStar recompleted the Graves 2-32 well before it filed its pooling application. By that time, SouthStar had already incurred the cost to recomplete the well. The well produced substantial revenue until it was shut in by the time pooling applications were heard. As a practical matter, the pooling order resolved 7C's participation costs, which would ultimately determine 7C's share of an already-existing pool of revenue, none of which 7C has ever received. Because SouthStar disputed 7C's rights in the lease, most of those funds were paid into the Western District, and out of reach of both parties pending resolution of that case.

¶37 However, as 7C raised before the Commission and as SouthStar's briefing appears to acknowledge, SouthStar holds or did hold in suspense another pool of money--$256,084.39--pending determination of 7C's rights in the lease. It is not mentioned in the Referee's report, or in the pooling order. Prior to the final pooling order the Commission entered a "deliberation order" that set forth its reasoning, which states:

The Referee reversed the ALJ's recommendation stating that such funds are suspended revenues paid into the U.S. District Court for the Western District of Oklahoma resulting from litigation between 7C and SouthStar and thus, fall outside of the Commission's jurisdiction for determining disposition of any such funds. . . . The Commission finds that if 7C elects to participate in the order it should be given the standard 25 days from the issuance date of the order to pay its proportionate part of well costs.

Neither the Deliberation Order nor the record offer insight into the determination that it was necessary for 7C to advance costs for the well, already drilled and producing revenue, other than the Commission's determination that it had no jurisdiction over the funds held by the Western District. It appears from the record that the Commission was either not aware of or did not consider the funds held separately by SouthStar in its determination.

¶38 For this reason, we find the Commission's Order on this point is unsupported by substantial evidence and remand for further proceedings to consider the funds held in suspense by SouthStar in its determination of whether 7C should have been required to advance costs in order to participate under the complete facts of this case.

CONCLUSION

¶39 For the foregoing reasons, we find that the Commission's determination of participation costs set forth in the pooling order is not contrary to law and is supported by substantial evidence, both on the costs related to the Graves 2-32 well and saltwater disposal costs, and we affirm the pooling order on those grounds. However, we reverse the Commission's determination that 7C prepay its participation costs, because it appears the funds held in suspense by SouthStar itself were not considered in that determination, and remand for further determination on that issue consistent with this Opinion.

¶40 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

FISCHER, C.J., and BARNES, P.J., concur.

FOOTNOTES

Marathon Oil Co. v. Oklahoma Corp. Comm'n, 1982 OK 19651 P.2d 1051Marathon requires assessment of total drilling costs. We do not interpret the Commission's Order, or 7C's arguments, to take the position that SouthStar is entitled to nothing for the original drilling of the well through upper formations, and the Commission plainly set an amount to recoup those costs in part, in addition to the recomplete and lease operating expenses. Rather, the issue is the proper measure of those drilling costs through the upper formation.

New Dominion, a pooling applicant's engineer testified that a $0.50 per barrel charge for saltwater disposal was a fair and reasonable cost for pooling, but admitted she had not reached that figure by determining actual disposal costs. Other evidence suggested that, after allocating the costs to drill, complete and equip the saltwater disposal wells at issue, the cost per multiple producing wells was only $.05 per barrel. The Commission adopted the $0.50. The Court of Civil Appeals reversed, because the $0.50 did not represent the applicant's actual expenditures to drill and produce the well.

disposal only, and does not incorporate the cost it incurred to build a pipeline between the Graves 2-32 and the Minter well. For our purposes, we treat these arguments as one and the same--SouthStar wishes to recoup its original cost to drill and produce (or dispose into) the well.

See Grand River Dam Auth. v. Eaton, 1990 OK 133803 P.2d 705

See Okla. Admin. Code 165:5-15-3 (2010).